INDUSTRIAL INDEMNITY
COMPANY, Appellant,

v.

WICK CONSTRUCTION COMPANY,
Appellee.

KENAI GLASS COMPANY,
INC., Appellant,

v.

WICK CONSTRUCTION COMPANY,
Appellee.

Nos. 6012/6759, 6059/6758.

Supreme Court of Alaska.

March 2, 1984.

Paul W. Waggoner, Biss & Holmes, Anchorage, for appellant, Industrial Indemnity Co.

Robert C. Erwin, Erwin, Smith & Garnett, Anchorage, for appellant, Kenai Glass Co.

Lawrence T. Feeney, Faulkner, Banfield, Doogan & Holmes, Juneau, and Herman S. Siqueland, Siqueland & Holcomb, Seattle, for appellee, Wick Construction Co.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON, and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

These consolidated appeals arise out of a contract awarded to Wick Construction Company for the construction of the Juneau courthouse and office building. Appellants Kenai Glass Company and Industrial Indemnity Company raise numerous issues on appeal.

In February 1973, the Alaska State Housing Authority (ASHA) awarded the contract to construct the Juneau court and office building to Wick Construction Company. Wick subcontracted all work relating to the fabrication and erection of the curtainwall, an aluminum and glass structure enclosing the building, to Kenai Glass Company. Kenai's performance was secured by a performance bond issued by Industrial Indemnity Company.

For various reasons, the building was completed and accepted 414 days late. Inasmuch as the principal cause for the delay appeared to be Kenai's failure to install the curtainwall before the onset of winter, Wick withheld the final payment due Kenai under the subcontract. Kenai sued for the

retainage. Wick counterclaimed, alleging that Kenai breached the subcontract by failing to fabricate and install the curtainwall in a timely manner. Wick also filed a third party complaint against ASHA, alleging that the architectural specifications provided by that entity were defective and the cause of some, if not all, of the delay. ASHA in turn proceeded against its architects, CCC/HOK.

In August 1980, Wick settled with ASHA and the third party complaint was dismissed. Due to a clerical error, notice of the settlement was not communicated to Kenai until October 28, 1980. On November 17, Kenai moved to continue the December 1 trial date. The motion was denied. Wick prevailed at trial.

Kenai then moved for a new trial on the grounds of newly discovered evidence; the motion was denied. Kenai and Industrial Indemnity filed separate appeals, alleging numerous errors in the conduct of the trial. [appeal nos. 6012 and 6059]. Subsequently, Kenai and Industrial Indemnity also moved for relief from judgment under Alaska Rule Civ.P. 60(b). These motions were denied and the movants appealed [appeal nos. 6758 and 6759]. The cases have been consolidated for argument and decision.

## I. DAMAGE ISSUES

### A. *Introduction*

The lower court found that Kenai's delay in fabricating and erecting the curtainwall accounted for 264 days of the 414 day delay. The court isolated four specific causes of delay: (1) delay in ordering the mullions and muntins (aluminum extrusions forming part of the curtainwall); (2) delay in requesting permission to change to a two-piece mullion; (3) delay in manufacturing and testing a sample insulated cur-

tainwall panel; and, (4) delay in installing the various components.

The lower court found that Wick had suffered three distinct types of harm as a result of Kenai's failure to install the curtainwall in a timely manner: (1) direct damage, consisting of increased labor costs, extended job overhead, unabsorbed home office overhead, and unanticipated winter protection costs; (2) indirect damage in the form of liquidated delay damages paid to the state; and (3) indirect damages in the form of delay damages paid or owing to the other subcontractors on the project. Wick was awarded $765,654.00 in total damages, including profits on its increased costs but excluding interest and attorney's fees.

■ Kenai advances an argument with respect to each element of damage. First, it argues that the subcontract limits Wick's recovery for its direct damage to $400.00 per day of delay.[1] Second, it argues that Wick did not actually pay any liquidated damages to the state and thus cannot recover the liquidated damages amount from Kenai. Finally, Kenai argues that it is under no obligation to indemnify Wick for damages paid or owing to the various subcontractors injured by Kenai's breach.

Subsidiary damage issues include the lower court's failure to offset the $360,000 received in settlement from ASHA against the judgment returned against Kenai Glass and the proper amount of prejudgment interest.

### B. *Liquidated Damages.*

Clause (a) of the subcontract provides in relevant part:

So far as the SUBCONTRACT work is concerned, SUBCONTRACTOR shall assume toward the CONTRACTOR all the obligations and responsibilities which the

---

**1.** Wick argues that the liquidated damages defense is an affirmative defense and that Kenai's failure to plead the defense precludes it from raising the issue on appeal. The findings of fact and conclusions of law, however, indicate that the matter was actually litigated and consequently Kenai is entitled to address the point on appeal. Alaska R.Civ.P. 15(b).

Wick makes the same waiver argument with respect to several other issues on appeal. With the exception of the ASHA settlement offset question, however, these procedural arguments lack merit.

CONTRACTOR assumed toward the owner, and shall be entitled to all the privileges and protections granted to the CONTRACTOR by the owner, by the main contract, ...

■ Clause (a) is what is known as a flow down or conduit clause. R. Cushman, The Construction Industry Formbook, § 5.08 (1979). Such clauses are designed to incorporate into the subcontract those provisions of the general contract relevant to the subcontractor's performance. If a conduit clause is used, "the same rights and duties should flow equally from the owner down through the general contractor to the subcontractor, as well as flowing from the subcontractor up through the general contractor to the owner." *Id.* The parties to the subcontract thus assume the correlative position of the parties to the prime contract. A. Dib, Forms and Agreements for Architects, Engineers and Contractors, Chap. 7, § 1[1] (1979).

Kenai argues that clause (a) incorporates the liquidated damages provision of the prime contract into the subcontract. The liquidated damages figure specified in the supplementary provisions to the prime contract is $400 per day of delay.[2] Accordingly, Kenai asserts that its liability for direct damages incurred by Wick is restricted to $400 per day of delay for which it was responsible. We agree.

■ Clause (a) of the subcontract confers on Kenai all of the "privileges and protections" as against Wick that the prime contract confers on Wick as against ASHA. The liquidation of delay damages in the prime contract is clearly within the ambit of "privileges and protections" afforded Wick by ASHA. The liquidation provision limits Wick's liability for delay damages incurred by ASHA to the stipulated amount of $400 per day and thus precludes recovery by ASHA of actual damages in excess of that amount, even if proved. The same limitation of liability for delay damages passes through the conduit clause from the prime contract into the subcontract to protect Kenai as against Wick. This result is in accord with cases in other jurisdictions wherein a damage limitation clause in the prime contract was incorporated into the subcontract through a conduit clause to protect the subcontractor from liability for actual damages incurred by the general contractor. *See, e.g., McDaniel v. Ashton-Mardian & Co.,* 357 F.2d 511, 516–17 (9th Cir.1966); *Walter R. Cliffe v. Dupont Eng. Co.,* 298 F. 649 (D.Del.1924); and *Coast Sash and Door Company v. Strom Construction Company,* 65 Wash.2d 279, 396 P.2d 803 (1964).

Wick argues to the effect that the conduit clause incorporates only the substantive aspects of the prime contract relating to Kenai's portion of the work, such as building specifications, and not the remedial provisions. It asserts that the interpretation urged by Kenai would bring clause (a) into conflict with clauses (c), (k), and (m), which negates an inference that the parties intended such an interpretation. We find no merit in Wick's contentions.

■ There is no inconsistency between clause (a) and any of clauses (c), (k), or

---

**2.** *The applicable delay damages clause contained in the general provisions of the prime contract is clause 26(b). It reads as follows:*
 If the owner does not terminate the right of *the Contractor to proceed as provided in paragraph a. hereof, the Contractor shall continue the work in which event he and his sureties shall be liable to the owner in the amount set forth in the specifications or accompanying papers for fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted, or if liquidated damages are not so fixed, any actual damages occasioned by such delay.*
This clause, therefore, makes it clear that if there is a liquidated damages clause set forth such damages are to be utilized in lieu of *any* actual delay damages. In this contract a liquidated damages clause was set forth in the supplementary general provisions. It provides:
 SGP8 LIQUIDATED DAMAGES: (Reference general provisions Articles 25 and 26)
 Liquidated Damages will be assessed in the amount of $400.00 per day for each calendar day beyond the time for completion stated on the Construction Contract or any extensions thereof that may be granted until the work is determined by the Contracting Officer to be Substantially Completed for Occupancy. No extension of time will be granted for winter shutdown.

(m).[3] Clause (c) merely makes explicit Kenai's liability to Wick if, on account of delay caused by Kenai, liquidated damages are assessed against Wick by ASHA pursuant to the prime contract. The respective liquidated damage amounts that are explicit in the prime contract and implicit in the subcontract are necessarily identical. There is no inconsistency between clauses (a) and (c).

■ In regard to the relationship between clauses (a) and (k), Wick is correct in asserting that, pursuant to clause (k), if the contractor believes that the "subcontractor's performance is delayed, behind schedule, the contractor may terminate the subcontractor's right to proceed with the work and may itself take over and complete the subcontract work, ... '*without prejudice to the CONTRACTOR'S other rights or remedies for any loss or damage sustained.*'" (emphasis in Appellee's Br.). (Appellee's Br. at 6–7). Wick's conclusion that this provision indicates the parties' intention that Kenai's liability for delayed performance would not be limited by a liquidated damage clause, however, is a non sequitur. Clause (k) does not purport to define the scope of the contractor's "other rights or remedies." Clause (k) merely provides that, if Kenai's performance is

delayed, the contractor can terminate Kenai's right to perform without compromising any claim against Kenai that it otherwise has for delay damages. To the extent that such damages are delay damages they are governed by the liquidated damage amount incorporated in the subcontract through clause (a). Further, not all such damages will necessarily be delay damages. A subcontractor may fail to perform early in the job and be replaced by another subcontractor who is able to complete the job on time, but at a higher price. The general contractor's damage claim against the first subcontractor in such case would not be a claim for delay damages. Clause (a) patently is compatible with clause (k).

■ Clause (m) is a general indemnification provision covering a myriad of possible losses or other damages that Wick might incur "arising out of, in connection with, or incident to" Kenai's performance. It is not inconsistent with such a provision to further stipulate a liquidated amount with respect to a particular type of damage, such as delay damage. This is precisely what the parties have done in clause (a). Although Wick can seek actual damages on any cause of action it has against Kenai other than that which accrued to it as a result of Kenai's delayed performance, its

---

**3.** Paragraph 3 of the Subcontract provided that in consideration of payment of the Subcontract amount, Kenai agreed:

3. To be bound by the PROVISIONS PRINTED ON THE REVERSE SIDE HEREOF, which are hereby incorporated herein by reference and made a part of this Subcontract.

. . . .

(c) CONTRACTOR shall give to SUBCONTRACTOR reasonable notice of desired starting time. SUBCONTRACTOR shall start work on date named by the CONTRACTOR, and shall complete the several portions and the whole of the work herein sublet, at such times as will enable the CONTRACTOR to fully comply with the contract with the owner, and be bound by any provisions in the main contract with the owner for liquidated damages, if caused by SUBCONTRACTOR.

. . . .

(k) SUBCONTRACTOR shall commence and at all times carry on, perform and complete this subcontract, to the full and complete satisfaction of the CONTRACTOR. It is specifically understood and agreed that in the event

the CONTRACTOR shall at any time be of the opinion that the SUBCONTRACTOR is not proceeding with diligence and in such a manner as to satisfactorily complete said work within the required time, then and in that event the CONTRACTOR shall have the right, after reasonable notice, to take over said work and to complete the same at the cost and expense of the SUBCONTRACTOR, without prejudice to the CONTRACTOR'S other rights or remedies for any loss or damage sustained.

. . . .

(m) The CONTRACTOR and SUBCONTRACTOR agree to indemnify and save harmless each other from and against any and all suits, claims, actions, losses, costs, penalties and damages of whatsoever kind or nature, including attorney's fees, arising out of, in connection with, or incident to, each party's performance of his particular portion of this contract. The parties may agree to arbitration pursuant to the procedures adopted by the American Institute of Architects, the American Arbitration Society or applicable law.

recovery on that particular cause is limited to the liquidated amount. Clause (a) is not inconsistent with clause (m).

We thus find no support in the language of the subcontract, read as a whole, for the proposition that clause (a) was not intended to incorporate in the subcontract the liquidated damages provision of the prime contract. Wick has cited no authority to support its contention that the obligations but not the rights and remedies of the prime contract passed through the conduit clause into the subcontract, and we have found none. Indeed, one commentator has noted that "[i]t is patently unreasonable for the general contractor to attempt to bind the subcontractor to the provisions of the general contract while the general contractor does not give the corresponding rights, remedies, and redress to the subcontractor." R. Cushman, The Construction Industry Formbook, § 5.08 (1979).

▊ We hold that the liquidation of delay damages in the prime contract is incorporated in the subcontract. We hold further that the liquidated damage provision in the subcontract subsumes both direct and indirect delay damages incurred by Wick.[4] It is therefore unnecessary to consider Kenai's arguments with respect to particular elements of Wick's direct damages, viz. profits on increased costs and unabsorbed home office overhead. The liquidated damage provision establishes as well as limits Kenai's liability. It is also unnecessary to consider whether Kenai otherwise would be liable to indemnify Wick for liquidated damages assessed by ASHA or for payments by Wick to other subcontractors injured by the delay caused by Kenai.

### C. *The ASHA Offset.*

Kenai contends that the trial court should have offset the $360,000 received in settlement from ASHA against the judgment returned against Kenai Glass. Kenai reasons that the court's failure to offset

resulted in Wick recovering twice for the same injury.

▊ Wick responds that this point is being raised for the first time on appeal. We note that neither appellant contravenes Wick's assertion that the matter was not brought to the trial court's attention. Accordingly, we conclude that the issue should not be considered on appeal. *See University of Alaska v. Simpson Building Supply Co.*, 530 P.2d 1317 (Alaska 1976); *Mitchell v. Knight*, 394 P.2d 892 (Alaska 1964).

### D. *Prejudgment Interest.*

Kenai maintains that the trial court erred in calculating the amount of prejudgment interest on the contract retainage allowed as an offset. Wick did not pay Kenai the final payment due under the subcontract. The lower court ruled that Kenai was not entitled to its final payment until Wick received its final payment from the owner, ASHA. As Wick did not receive its final payment from ASHA until July 28, 1980, the court ruled that Wick's obligation to pay Kenai arose on August 3, 1980. Consequently, prejudgment interest was calculated from that date.

▊ The focus of this dispute is clause (d) of the subcontract. That clause provides, in part: "Final payment shall be made within five days after CONTRACTOR has received his final or complete payment involving SUBCONTRACTOR'S portion of work." Such contingent payment clauses are common in the industry. Cushman notes that "the subcontractor runs the risk of not getting paid if payment to the subcontractor is contingent upon payment by the owner to the general contractor." R. Cushman, The Construction Industry Formbook, § 5.04 (1979). Given the court's finding, unchallenged on appeal, that Wick was not paid until July 28, 1980, Kenai was not entitled to its payment until

---

**4.** As noted previously, liquidated damages under the prime contract are in lieu of "any actual damages occasioned by ... delay." Note 2 *su-* *pra.* This language can most reasonably be interpreted to encompass all damages occasioned by delay, direct or indirect.

August 3, 1980 and interest accrues from that date forward.

## II. THE DENIAL OF KENAI'S MOTION TO CONTINUE THE TRIAL DATE

In August 1980, Wick settled with ASHA with respect to Wick's claim against the state. Through error of the court clerk, notice of the settlement was not communicated to Kenai's counsel until October 27, 1980. Kenai moved to continue the December 1 trial date on November 14. The motion was denied.

Kenai advanced the following arguments in support of its motion:

(1) Wick had originally asserted that the delay in construction was attributable to defective specifications, specifications provided by ASHA. Kenai's defense to Wick rested on the defective specification ground;

(2) In settling with ASHA and pursuing claims against Kenai alone, Wick changed the nature of the trial to Kenai's "surprise";

(3) Given this change in direction, Kenai's counsel needed time to acquire other counsel and acquaint counsel with the facts and issues.

When Wick settled with ASHA, the nature of the trial and Kenai's role therein changed considerably. Kenai had intended to be a bystander while Wick and ASHA litigated the various defective specification claims. In essence, Kenai was relying on Wick to establish the defective specification claim against the state and, in so doing, establish Kenai's defense against Wick. Once Wick settled with ASHA, however, Kenai was forced to prepare its own defective specifications defense.

It is clear, however, that Kenai has no grounds upon which to claim surprise. Count 5 of Wick's counterclaim states that Kenai "breached its subcontract with defendant Wick Construction Company by failing to complete the work required thereunder in a timely fashion." Wick's pretrial memorandum, dated March 7, 1980 at 2,

states: "Wick expects to prove that plaintiff breached its curtainwall supply and erection subcontract ... by failing to complete that work or specific portions thereof at such reasonable times as would have enabled Wick to complete the other work required under the prime contract...." Further:

> Wick is claiming in the alternative that if ASHA is not liable to defendant Wick as alleged, above, then plaintiff is liable to Wick for *all* of the *direct* and *delay costs* of the entire project.... At this time, it appears that such alternative liability would be in the approximate sum of $1,425,000.00....

*Id.* at 7–8. (Emphasis added.)

Given the pleadings and the pretrial memorandum, we conclude that Kenai was on notice that Wick might pursue a claim against it for the majority of the delay damages. We agree with the trial court that Kenai's predicament was essentially the consequence of its neglect. The lower court did not abuse its discretion in denying Kenai's motion to continue the trial date.

## III. CONTRACT AMBIGUITY AS IT RELATES TO TESTING REQUIREMENTS

The lower court attributed approximately eight months of delay to Kenai's failure to fabricate and test an insulated curtainwall panel. Kenai received the shop drawings on April 17, 1973, yet did not test a sample panel until May 6, 1974. In defense, it argues that the contract provisions governing testing are in conflict, that the contract is necessarily ambiguous, and that the ambiguity excuses any delay in performance.

Initially, it should be noted that even if we accept Kenai's argument, the result below would remain unchanged. The trial court found that Kenai had delayed eight months in fabricating and testing the panels, three and one-half months in ordering the muntins, four and one-half months in changing to a two-piece mullion, and several months in assembling the whole. All told, however, the court held Kenai respon-

sible for only 264 days of delay; half of the cumulative delay itemized above.

 Kenai does not challenge the court's findings concerning the delay in purchasing and assembling the mullions and muntins. Indeed, it went uncontroverted below that much of the delay was caused by a shortage of the various components (principally mullions).[5] What Kenai thus fails to acknowledge is that the delay in ordering and installing the mullions and muntins alone supports the finding that Kenai caused 264 days of delay. As a result, it is of no consequence that the court may have been mistaken about the delay in fabricating and testing the panels.

### IV. THE ADEQUACY OF THE FINDINGS OF FACT

Industrial Indemnity argues that the trial court delegated to Wick's counsel its obligation to find the facts and issue conclusions of law, and thus did not comply with Alaska Rule of Civil Procedure 52. Industrial Indemnity concludes that the case should be remanded so that the court may independently consider the record.

 Alaska Rule of Civil Procedure 78(a) provides in part that "counsel for the successful party to an action or proceeding shall prepare in writing ... all findings of fact [and] conclusions of law ...." Rule 78(a) was not intended to delegate to counsel the court's duty of finding the facts. *Fairbanks Builders, Inc. v. Morton Delima, Inc.*, 483 P.2d 194, 197 (Alaska 1971). A trial court is, however, entitled to adopt findings and conclusions prepared by counsel, so long as they reflect the court's independent view of the weight of the evidence. A court may adopt attorney-prepared findings even in jurisdictions lacking a rule equivalent to Rule 78(a). *See e.g., Jesko v. Stauffer Chemical Co.*, 89 N.M. 786, 558 P.2d 55, 58–59 (App.1976). We are not persuaded that the lower court failed to find the facts independently in the case at bar.

### V. THE MOTION FOR A NEW TRIAL

Industrial Indemnity argues that the lower court abused its discretion in denying the motion for a new trial. It argues that the ASHA settlement brought to light new evidence which might alter the outcome were a new trial granted. Briefly summarized, this evidence relates to ASHA's conviction that an aluminum curtainwall panel could not be fabricated according to the contract specifications and that the specifications were therefore defective. The evidence contradicts the testimony of Lou Casseta, ASHA's architect, that panels could be fabricated according to the specifications and that a glassweld panel was substituted solely to save money and speed up production.

 Industrial Indemnity contends that, if granted a new trial, it could develop an impossibility defense concerning the panel fabrication based on the additional evidence. Presumably, this defense would excuse Kenai's delay in fabricating and installing the panels. As noted above, however, even if Industrial Indemnity were to establish such a defense, the result below would remain unchanged. The inescapable fact remains that the delay attributable to ordering and installing the aluminum extrusions (delay reflected in findings of fact unchallenged on appeal) more than accounts for the 264 days of delay held against Kenai. A new trial will not be granted on the basis of newly discovered evidence unless the evidence would probably change the result on a new trial. *Montgomery Ward v. Thomas*, 394 P.2d 774 (Alaska 1964).

For the reasons stated above, we affirm the judgment below in part and reverse it in part. We remand to the superior court for calculation of damages in accordance with this opinion. Prejudgment interest and attorney's fees will also be recalculated.

---

**5.** We note that Kenai could not plausibly argue that it delayed in ordering the mullions and muntins because it anticipated the delay in ob- taining the panels. Our review of the record indicates that the delays were entirely unrelated.

AFFIRMED in part, REVERSED in part and REMANDED.

BURKE, Chief Justice, with whom COMPTON, Justice, joins, dissenting in part.

I respectfully disagree with the conclusion that Wick's damage claim against Kenai must be measured by the liquidated damages provision of the prime contract.

The damages Wick suffered as a result of Kenai's delay in performance bear no relationship to the liquidated damages ASHA had been willing to accept for being delayed in occupying the courthouse. Whereas ASHA's delay damages arose solely from delayed occupancy, Wick's claim for delay damages included the liquidated damages assessed by ASHA under the prime contract, increased materials, labor and overhead costs of Wick's business operations as contractor, and money damages owed by Wick to other subcontractors who suffered delay damages as a result of Kenai's untimely performance. And, in contrast to ASHA's damages for delayed occupancy, Wick's actual damages attributable to Kenai's breach were both easily forseeable and readily calculable.

For these reasons, I conclude that Wick and Kenai did not intend to adopt the liquidated damages figure as the measure of damages for the breach of *their* agreement. On the contrary, I read the incorporation clause as incorporating only the substantive provisions of the prime contract governing building specifications and the like. Thus, I would hold that Wick is entitled to seek actual damages for the harm it suffered as a result of Kenai's breach.