**Yvan SAFAR, Appellant,**

v.

**WELLS FARGO BANK, N.A., Appellee.**

No. S–13710.

Supreme Court of Alaska.

July 15, 2011.

Hugh G. Wade and Marion C. Kelly, Wade, Kelly & Sullivan, Anchorage, for Appellant.

Patrick B. Gilmore, Atkinson, Conway & Gagnon, Inc., Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

*OPINION*

STOWERS, Justice.

## I. INTRODUCTION

In June 2006 Yvan Safar, a contractor and sole owner and shareholder of Safar Construction, Inc., contracted with developer Per Bjorn–Roli, sole owner and shareholder of Norway Estates, LLC, to construct six units in a 12–unit condominium project in Girdwood for a "not to exceed" price of $2,990,434. Wells Fargo Bank agreed to loan up to $3.3 million to Norway to finance the project. By early May 2007 Norway had paid Safar the entire amount of his contract and Wells Fargo had disbursed the entire loan, but the units were not complete. Safar contends that he offered to use his personal funds to continue to meet payroll until Wells Fargo could devise a solution to the cost overruns, and that Cindy Jobe, a vice president of Wells Fargo who was responsible for disbursing and managing Norway's loan, repeatedly promised that Safar would be reimbursed. Jobe denies making any such promise. Safar continued to work on the project and use his personal funds to make payroll until Wells Fargo initiated foreclosure proceedings in July 2007. Safar sought damages of at least $500,000 for personal funds advanced to continue the project on a theory of promissory estoppel. After trial, the superior court found that Wells Fargo made no enforceable promise to Safar to reimburse him, dismissed Safar's claims with prejudice, and entered judgment for Wells Fargo. Safar appeals. We affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Parties and project

Norway Estates, LLC ("Norway") is an Alaska limited liability company formed and solely owned by Per Bjorn–Roli, a retired insurance company executive. Norway planned to build a 12–unit condominium project in Girdwood ("the Project").

Yvan Safar, an experienced contractor and sole proprietor, formed Safar Construction, Inc. in September 2006 for the purpose of contracting with Norway to build six of the condominium units. Safar was the sole officer, director, and shareholder of Safar Construction.

In July 2006, Wells Fargo Bank, N.A. ("Wells Fargo") agreed to loan up to $3.3 million to Norway to finance construction of the first six units of the 12–unit condominium project. Bjorn–Roli did not cosign in his individual capacity or personally guarantee payment of the loan. Cindy Jobe, a vice

president of Wells Fargo and a "knowledgeable and experienced" loan officer, originated and was responsible for administering the loan.

On June 26, 2006, Safar Construction contracted with Norway to complete the six units by November 20, 2006 on a "cost plus" basis for a "not to exceed" price of $2,990,434. Safar prepared the contract and cost schedules with Bjorn–Roli based on rough estimates from plans that "were not completely detailed" because Safar did not have sufficient time to complete them. Safar hired a bookkeeper, Carol Howerton, as a subcontractor to track costs and do payroll. Safar paid himself wages as an employee of Safar Construction; he received $45 an hour and overtime. Safar also planned to purchase one of the six units for approximately $750,000.

## 2. Construction and overruns

Safar did not complete the six units by November 20, 2006, and prospective purchasers began to cancel their reservations. From December 2006 to March 2007, Safar reported to Norway that the project was on budget; Norway made the same reports to Wells Fargo. According to Safar, the project was delayed because of "all kinds of unforeseen problems," such as municipal digging restrictions, a buried electric cable, foundation problems, and heavy rain and snow. Safar testified that he remained on budget throughout the winter notwithstanding the delays, but by February/March 2007 it became "really obvious" that he was experiencing cost overruns.

Initially, Safar believed that he could use the 18% markup included in the construction contract price to cover the overruns. By March 22, 2007, Bjorn–Roli determined that the overruns were at least $700,000, and Safar knew that he would need more money to complete the Project, but neither Bjorn–Roli nor Safar informed Wells Fargo.

Later in the spring of 2007, Safar and Bjorn–Roli informed Wells Fargo that Safar was over budget by approximately $100,000;

neither Safar nor Bjorn–Roli expressed concern about the overruns, and Bjorn–Roli did not request a loan increase. Wells Fargo honored every draw request submitted by Norway and fully advanced the $3.3 million loan. Safar was out of money by April 20, 2007; he withdrew $10,000 from his personal account to cover payroll on April 20th, but many bills remained unpaid.

### 3. Meetings with Jobe

In late April, Safar and Bjorn–Roli met with Jobe to discuss cost overruns on the Project. They informed Jobe that overruns totaled approximately $250,000, and Jobe asked them to "refine and confirm" the number. When Safar and Bjorn–Roli met with Jobe a second time on May 7, 2007, Safar gave Jobe a written cost estimate of $590,000 to complete the Project but did not disclose that there were unpaid bills. Bjorn–Roli told Safar and Jobe that he was not going to put any of his own money into the Project to cover overruns or pay Safar any more than the contract price of $2.9 million.

According to Bjorn–Roli, Jobe stated that it would take a "couple more weeks to get some sort of approval to go above the bank loan limit," and that she would need approval from others at the bank before she could provide additional funds. According to Bjorn–Roli, Safar told Jobe that he could take part of his down payment for the condominium he was planning to purchase to cover payroll if Jobe promised that he would get his money back, and Jobe assured Safar that he would get his money back.[1]

According to Jobe, she made no promise to reimburse Safar. She testified that the parties discussed releasing some of the funds from the expected closing of Safar's unit to help fund the overruns but that she made no commitments, no agreements were reached on the material terms of such an arrangement, and there was no discussion of Safar's down payment. She also testified that the "resolution" they agreed upon was that Wells Fargo would try to increase Norway's loan

---

1. When asked exactly what Jobe said, Bjorn–Roli stated: "She said, of course.... Of course he'd get his money back. And she thought that was a good solution to this dilemma."

by \$250,000 to \$300,000.[2] According to Jobe, neither Safar nor Bjorn–Roli said anything about not proceeding with construction at the late April or May 7th meetings.

■ Safar testified that he informed Jobe and Bjorn–Roli at the April meeting that he was running out of money and would have to shut down the Project unless they came up with "some solution as far as funds." Safar testified that Bjorn–Roli and Jobe discussed the possibility of using proceeds from the sale of Safar's unit, for which a Certificate of Occupancy[3] had been issued, to complete the Project. According to Safar and Bjorn–Roli, Safar told Jobe and Bjorn–Roli at the May 7 meeting that Safar Construction had no more funds and would need to stop working if Wells Fargo could not provide any additional funding. Safar testified that "Bjorn–Roli and Vice President Cindy Jobe definitely didn't want to stop the construction" because of two pending sales, so Safar offered to use his own funds to cover payroll for a week until Jobe could find another solution. Safar claims that Jobe made a "direct promise" to him that the personal money he used to cover the payroll would be returned to him.

After the May 7, 2007 meeting, Bjorn–Roli left for a planned vacation in Europe. When Bjorn–Roli returned to Anchorage, he met with Jobe to discuss possible solutions to overruns; Safar was not present. Jobe proposed loaning Norway an additional \$250,000 to \$300,000 to be secured by a personal guarantee from Bjorn–Roli, with Bjorn–Roli or Safar to fund any additional sums needed to complete the Project; Bjorn–Roli refused to guarantee any loan personally, and no agreement was reached. According to Jobe, she also suggested the idea of taking a partial payment at the closing of the unit Safar planned to purchase and putting the rest back into the Project, and Bjorn–Roli "was receptive" to the idea. Jobe testified that this never occurred, however, because the

bank was "waiting for a unit to close," which never occurred.

### 4. Post-meeting construction

Following the May 7 meeting, Safar continued to use his own funds to make payroll for "four to five weeks." According to Safar, Jobe repeated her promise that he would be reimbursed "week after week" when Safar called Jobe to check on the status of his reimbursement.

According to Jobe, when Safar called to ask if the bank had reached a resolution, she told Safar that the bank was working on a resolution but never discussed what the resolution might be or made any promises.

### 5. Wells Fargo foreclosure of the Project

At the end of June, Jobe turned over the Norway account to Gerard Diemer in the Credit Management Group at Wells Fargo. On June 28, 2007, Safar's bookkeeper faxed an estimate to Diemer of \$446,000 to complete construction on the Project and \$529,000 in outstanding payables; the total estimated overrun was \$975,000. After several meetings with Bjorn–Roli, Wells Fargo decided that no reasonable work-out agreement could be reached and decided to proceed with foreclosure.

Diemer visited the Project site in early July and found Safar and his team working. When Diemer discovered that Bjorn–Roli had not informed Safar that he should stop working, Diemer called Bjorn–Roli, informed him that Safar was still working, and handed the phone to Safar so that Bjorn–Roli could tell Safar to stop.

Safar informed Diemer that he had a tape recording of Jobe promising him that he would be reimbursed for the money he spent on the project. Diemer conducted an extensive investigation into Safar's allegations and concluded that there was no evidence to sub-

---

**2.** This amount was seen as a sufficient "fix" because Bjorn–Roli had indicated that he could get by with \$250,000 to \$300,000 in addition to proceeds from the pending sales of two units.

**3.** A Certificate of Occupancy is a document issued by the municipality after a building official has inspected a building project and found no

violations of any ordinance, plat note, or building or zoning code. *See Spinell Homes, Inc. v. Municipality of Anchorage,* 78 P.3d 692, 698 (Alaska 2003) (citing 3 Kenneth H. Young, Anderson's American Law of Zoning § 19.03, at 362 (4th ed. 1996)).

stantiate any of Safar's claims that Jobe had promised to reimburse him. Safar later admitted to Diemer that he had no recording and that a friend had suggested he "bluff" about the tape to get the bank to reimburse him.

### 6. Safar's mortgage

Safar applied for a mortgage with Residential Mortgage in early April 2007. Safar moved into a unit in the Project in early May 2007 and agreed to pay $2,500 in rent to Bjorn–Roli until his mortgage closed. Residential Mortgage ultimately denied Safar's mortgage. After the foreclosure, Safar refused to vacate the unit. Wells Fargo evicted Safar on May 1, 2008, but agreed to forgive April 2008 rent. Safar therefore owed Wells Fargo $11,917 in past due rent ($2,500 per month from November 7, 2007 to March 31, 2008).[4]

### B. Proceedings

On August 9, 2007, Wells Fargo filed a Complaint for Appointment of a Receiver Under AS 09.40.240. Norway resisted appointment of a receiver, moved to dismiss the complaint, and filed a counterclaim and third-party complaint against several bank officers. In its counterclaim complaint, Norway asserted 15 claims for relief based on predatory lending practices, breached/repudiated agreements/promises/commitments, fraud, intentional and/or negligent misrepresentations, breached covenant of good faith and fair dealing, estoppel, breach of the Unfair Trade Practices and Consumer Protection Act,[5] interference with prospective economic opportunities and contracts, waste, and defamation. Safar and Safar Construction filed an Answer and Counterclaim in Intervention, asserting direct claims against Wells Fargo based on promissory estoppel, fraudulent misrepresentation, and unjust enrichment. Safar also asserted that he was the equitable owner of the unit he occupied and sought to foreclose a claim of lien in the amount of $310,341.53 for unpaid wages from Safar

Construction and personal expenditures for labor and materials[6] that he had filed.

On April 7, 2008, Superior Court Judge Mark Rindner dismissed Safar's claim of equitable ownership or title to his unit, and ruled that Norway's claims against Wells Fargo and its employees be submitted to binding arbitration. The arbitrator rejected all of Norway's claims, finding that there was no contract between Wells Fargo and Norway to loan additional money to Norway. On April 9, 2009, the superior court approved a stipulation between Wells Fargo and Norway by which all of Norway's claims were dismissed and Wells Fargo waived any claim against Norway for costs and fees.

Safar's remaining claims against Wells Fargo proceeded to trial on September 1, 2009. Safar conceded that Safar Construction's claim of lien for outstanding wages should be dismissed and limited his claim to damages of "not less than $500,000" for personal funds advanced to pursue completion of the Project made in reliance on Wells Fargo's repeated assurances that he would be reimbursed.

On September 11, 2009, after hearing testimony from Safar, Howerton, Jobe, and Diemer, and considering the depositions of Bjorn–Roli and LaRose (the loan officer at Residential Mortgage who reviewed Safar's loan application), which were admitted into evidence, the trial court issued extensive findings of fact and asked both parties to file memoranda arguing the legal consequences of the findings and to propose conclusions of law. Wells Fargo filed a memorandum and proposed conclusions of law; Safar did not. Safar filed detailed objections to the court's findings of fact, which the trial court overruled without comment. The court issued its conclusions of law on October 12, 2009.

The superior court made three conclusions that are relevant to Safar's appeal: (1) Wells Fargo did not make a binding contractual commitment to pay or reimburse Safar's expenses because Jobe neither made an offer to

---

**4.** After Wells Fargo foreclosed on the Project, Safar's rent was owed to Wells Fargo.

**5.** AS 45.50.471–561.

**6.** Safar earned $22,623.73 in wages for his work on the Project, but he never cashed his payroll checks issued by Safar Construction.

Safar or Bjorn–Roli nor set forth all material terms of a contract; (2) Wells Fargo did not commit to releasing funds from the closing of Safar's condo purchase because there was no agreement on the material terms of the alleged agreement; and (3) Safar's claim for promissory estoppel was barred because Jobe did not make a definite promise encompassing all the material terms of a contract, and because Safar could not have reasonably relied upon his understanding that there was a "promise" when the promise "did not identify the amount of money to be advanced, the terms of repayment, or even who would be responsible for the repayment."

On November 2, 2009, the court issued a final judgment dismissing Safar's claims with prejudice and entering judgment for Wells Fargo for unpaid rent in the amount of $11,917 plus interest, costs, and attorney's fees.

Safar appeals.

## III. STANDARD OF REVIEW

▮ We review the trial court's findings of fact, including those on the credibility of witnesses, for clear · error.[7] We will find clear error if, after a thorough review of the record, we come to a "definite and firm conviction that a mistake has been made."[8] We review factual findings in the light most favorable to the prevailing party below.[9] "[W]e grant 'particular deference to the trial court's factual findings when they are based primarily on oral testimony, because the trial court, not this court, performs the function of

judging the credibility of witnesses and weighing conflicting evidence.' "[10]

▮ There are four elements of a cause of action for promissory estoppel: (1) an "actual promise" that induced action or forbearance; (2) the action induced was actually foreseen or reasonably foreseeable; (3) the action amounted to "a substantial change in position"; and (4) enforcement of the promise is necessary in the interest of justice.[11] The only element at issue in this case is whether there was an "actual promise" that induced action or forbearance, which is a question of fact that we review for clear error.[12]

## IV. DISCUSSION

The central issue raised by Safar on appeal is whether the trial court's findings of fact were clearly erroneous.[13]

Safar argues that the trial court clearly erred in: (1) failing to make specific factual findings about conflicting accounts of the May 7 meeting; (2) not finding promissory estoppel on the facts of the case; and (3) finding that Wells Fargo was entitled to costs, interest, and attorney's fees.

In response, Wells Fargo contends that: (1) the trial court · determined that Wells Fargo's account of what happened at the May 7 meeting was more credible than Safar's account; (2) Safar did not establish the elements of promissory estoppel; and (3) any

**7.** *Romero v. Cox*, 166 P.3d 4, 7–8 (Alaska 2007) (citing *Soules v. Ramstack*, 95 P.3d 933, 936–37 (Alaska 2004)).

**8.** *Id.* at 8.

**9.** *Id.* (citing *N. Pac. Processors, Inc. v. City & Borough of Yakutat*, 113 P.3d 575, 579 (Alaska 2005)).

**10.** *Wee v. Eggener*, 225 P.3d 1120, 1124 (Alaska 2010) (quoting *Millette v. Millette*, 177 P.3d 258, 261 (Alaska 2008)).

**11.** *See Alaska Trademark Shellfish, LLC v. State of Alaska, Dep't of Fish & Game*, 172 P.3d 764, 766 (Alaska 2007) (quoting *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1284 (Alaska 1985)

(applying RESTATEMENT (SECOND) OF CONTRACTS § 90 (1979)) (internal quotation marks omitted)).

**12.** *See Crook v. Mortenson–Neal*, 727 P.2d 297, 300 (Alaska 1986) (implying all four elements of promissory estoppel should be reviewed as questions of fact); 4 RICHARD A. LORD, WILLISTON ON CONTRACTS § 8:7, at 152 (4th ed. 2008) (noting that many jurisdictions consider both "the existence and the scope of [an actual 'promise'] to be questions of fact, and [a finding] ... that the promise exists [will stand] on appeal unless it is clearly erroneous.").

**13.** Safar states: "The single issue in this case is whether a promise was made." He also argues that the trial court "mischaracterized" his claim by analyzing it under a contract-based theory of

promise made by Wells Fargo was a conditional promise that was not breached.

We find that the record supports the trial court's findings of fact and conclusions of law.

### A. The Superior Court's Findings Of Fact Were Neither Incomplete Nor Clearly Erroneous.

Safar argues that the trial court dismissed Safar's claim without making any specific findings about the conflicting evidence regarding what was said at the May 7 meeting. He also argues that the trial court did not make specific factual findings on any of the factual issues Safar raised in his trial brief, and that the factual findings the court did make were "problematic."

In response, Wells Fargo asserts that the court's detailed findings of fact reveal that the court found Wells Fargo's account of what occurred at the May 7 meeting to be more credible than Safar's account.

We hold that the superior court's findings of fact were neither incomplete nor clearly erroneous.

### 1. The trial court did not fail to make specific findings regarding Jobe's alleged promises to Safar.

The superior court made 46 detailed findings of fact, many of which address the conflicting accounts of what Jobe allegedly promised to Safar. Specifically, the court found that Safar did not prove that the parties came to "a meeting of the minds" at the May 7 meeting as to all material terms of a contract to lend, noting that Safar could not articulate the details of any commitment by Jobe or Wells Fargo to reimburse him for expenses he incurred after May 7, such as

"the amount of the loan, the terms of repayment, the security, the interest rate, or even if the bank's supposed commitment was a loan or a gift."

The superior court also explicitly found that Safar did not prove a "promise" to lend with definite terms enforceable under the doctrine of promissory estoppel, or a "binding commitment, definite in all its material terms" to release proceeds of the bank's collateral from the expected closing of Safar's condo. The court further found that, even if Jobe had made a binding commitment, the commitment was not broken because Residential Mortgage did not approve Safar's loan, Safar did not purchase the unit, and "Wells Fargo had no duty to release proceeds from a closing that never occurred."

Safar's assertion that the trial court dismissed his claims without making specific findings about the conflicting evidence regarding Jobe's alleged "promise" is therefore incorrect.[14]

### 2. The trial court's findings of fact regarding Jobe's alleged promises to Safar were not clearly erroneous.

Safar suggests that any findings of fact the court did make regarding Jobe's alleged promises to Safar were "problematic." Wells Fargo argues that the trial court's findings regarding the conflicting accounts of what Jobe stated during and after the May 7 meeting illustrate that the trial court found Wells Fargo's version of the facts to be more credible than Safar's version.

■■■   Although the trial court did not make specific credibility findings, it is clear that the trial court found Wells Fargo's witnesses' accounts of what occurred to be more credible than Safar's witnesses' accounts: all 46

---

recovery. Thus, promissory estoppel is the only legal theory Safar argues on appeal.

**14.** Safar also claims that the trial court erroneously failed to find that Bjorn–Roli's account of the May 7 meeting, described in a letter Bjorn–Roli wrote ten weeks after the meeting, was "substantially accurate." The trial court's failure to make specific factual findings regarding the accuracy of Bjorn–Roli's letter was not clearly erroneous because the trial court provided more than enough "detailed and explicit find-

ings" to give this court a "clear understanding of the basis" of its decision. *Urban Dev. Co. v. Dekreon,* 526 P.2d 325, (Alaska 1974) (quoting Alaska R. Civ. P. 52(a)) (internal quotation marks omitted). Although Bjorn–Roli's letter generally corroborates Safar's account of the May 7 meeting, both Bjorn–Roli's and Safar's accounts of Jobe's statements support the superior court's finding that the statements were not sufficiently definite to constitute an "actual promise" under promissory estoppel. *See infra* Part B. Thus, Bjorn–Roli's corroboration would not have mate-

findings of fact support Wells Fargo's account of the conversations that occurred between Safar and Jobe.[15] During trial, the superior court articulated why it found Safar's account of the meeting problematic:

> [T]he whole problem I'm having ... is [Safar] almost seems to be saying that the Bank is going to give him this money to pay him off, and I don't believe that for a second occurred, or that if he believed that or thought that, I certainly am having trouble believing that it was reasonable for him to do it.... I'm going to have to resolve this as a credibility question.

A review of the record supports the trial court's findings that Jobe did not make any legally enforceable promises to Safar.[16]

### B. The Superior Court Did Not Err In Not Finding Promissory Estoppel On The Facts Of The Case.

Safar contends that the court committed legal error by not finding promissory estoppel because all of the elements of promissory estoppel were satisfied.

Four elements are needed to prove a claim of promissory estoppel: (1) an "actual promise" that induces action or forbearance; (2) the action is actually foreseen or reasonably foreseeable; (3) the action is a "substantial change in position"; and (4) enforcement of the promise is necessary in the interest of justice.[17] Safar argues that the evidence presented at trial proved all four elements.

The superior court found that Safar's claim for promissory estoppel failed because he did not prove the first element, and because his reliance on any alleged statements by Jobe would not have been reasonable.

■ We conclude that Safar's promissory estoppel claim fails because the record does not support a finding that Jobe made an actual promise to Safar.

■■ An "actual promise" is one that is "definitive, ... very clear, ... and must use precise language." [18] To be enforceable under promissory estoppel, a promise must be "analytically identical" to the acceptance of an offer in contract law: it must "manifest an unequivocal intent to be bound." [19] None of the alleged statements by Jobe to Safar constituted an "actual promise" for promissory estoppel purposes.

Safar argues that Jobe's assertion to Safar at the May 7 meeting that "of course" he would be repaid and the "words and conduct" Jobe used to "reinforce" the promise after May 7 constitute an "actual promise." He cites cases from other jurisdictions in which lenders' assurances to borrowers that they would "support," "help," or "work with" borrowers were sufficient "promises" to find that promissory estoppel applied. In contrast to the cases he cites, Safar was not a borrower, Jobe was not authorized to approve loans,[20] and neither Safar nor Wells

---

rially contradicted the court's ultimate legal determination.

**15.** Safar notes that the superior court adopted "nearly all" of Wells Fargo's proposed findings of fact "without edit or comment" but offers no explanation for why he did not submit his own proposed findings of fact. It is not clearly erroneous per se for a trial court to adopt one party's proposed findings of fact. *See Indus. Indem. Co. v. Wick*, 680 P.2d 1100, 1108 (Alaska 1984) ("A trial court is ... entitled to adopt findings and conclusions prepared by counsel, so long as they reflect the court's independent view of the weight of the evidence").

**16.** *See infra* Part B.

**17.** *Alaska Trademark Shellfish, LLC v. State of Alaska, Dep't of Fish & Game*, 172 P.3d 764, 766 (Alaska 2007) (quoting *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1284 (Alaska 1985) (applying RESTATEMENT (SECOND) OF CONTRACTS § 90 (1979)) (internal quotation marks omitted)).

**18.** *Id.* at 767 (quoting *Simpson v. Murkowski*, 129 P.3d 435, 442–43 (Alaska 2006)) (internal quotation marks omitted).

**19.** *Id.* (quoting *Brady v. State*, 965 P.2d 1, 6–11 (Alaska 1998)) (internal quotation marks omitted).

**20.** Diemer and Jobe testified that Jobe, as a loan officer, had absolutely no authority to create, approve, or modify a loan without approval from supervisors, and that her alleged promises would be "very much out of line and uncharacteristic" because "it isn't something that can happen." Diemer testified that it is appropriate and common for loan officers to talk to their borrowers about "things that, together, the borrower and the bank can do to resolve issues ... [w]hen borrowers get into trouble," and that he believed this is what Jobe had done. Although Safar contests the court's finding that Jobe lacked authority and argues that Jobe had "apparent authority" to promise that Safar would be reim-

Fargo contends that the possibility of Safar applying for or receiving a loan from Wells Fargo was discussed as a potential solution.

Safar also argues that a promise "may be simple or complex," and that Jobe's promise to Safar was simple: if he advanced his personal money for payroll, he would get his money back. He argues that a "general rule of contract" is that contracts may be enforced even if the parties have left open "some matters to be determined in the future" by examining the agreement itself or "other usage or custom" that is independent of a party's "mere 'wish, will and desire.'" He cites *Bank of Standish v. Curry*,[21] in which the court held that a borrower who went to a bank "for the express purpose of learning whether he would receive financing" could enforce the bank's promise to "continue to support" his business under promissory estoppel because the terms of the promise "could be objectively determined from the nature of the transaction, and the ten-year history of the customary loan practices between the parties."[22]

In contrast to the situation in *Curry*, Safar was not Wells Fargo's borrower, he had no history of borrowing from Wells Fargo, and he was not seeking to extend or receive a loan. Thus, there were no prior dealings, usage, or customs from which a definite promise could be gleaned.

In *Valdez Fisheries Development Association, Inc. v. Alyeska Pipeline Service Co.*,[23] we held that a prospective lessee's promise to a prospective lessor that he would receive a lease contract was not enforceable through promissory estoppel because the promise was ambiguous as to the lease duration and price. Similarly, the trial court in this case found that Safar could not articulate the basic terms of any agreement, such as the amount of money that would be advanced, the terms of payment, or who would be responsible for the repayment. The court also found that "Jobe did not make a definite promise as to all the material terms of a contract," and noted that Safar's own testimony established that "Jobe did not make any binding commitments to Norway and/or Safar."

The record supports the trial court's findings. When asked at trial about the specifics of Jobe's promise at the May 7 meeting, Safar stated: "I was assured that there would be no problem. . . . [Jobe] said you will get that money back as soon as the Bank and Bjorn–Roli have, you know, the extension of the loan or whatever terminology they use." Safar testified that there were not "any specifics discussed about it," but that he was under the "assumption" that the money would "go directly from the Bank" to him. When asked why he assumed Wells Fargo would pay him directly despite the fact that all Project funds he had received had come from Norway, Safar stated:

> Because [Jobe] was repeating it over and over and reassuring me and encouraging me to finish unit three so it can be sold, and since I knew she was the banker dealing with the project, I basically trusted her. . . . [I]t was clear to me she was the key person on the project.

On cross-examination, Safar testified that the word "loan" was never used in his discussions with Jobe, and that there were "different terms used, arrangement or whatever they were discussing. How they were going to do it, I don't know. I wasn't privy to that." Thus, according to Safar's own testimony, the proposed contract was not definitive as to any material terms.[24]

---

bursed, Safar's testimony reveals that he was aware that any "solution" would have to involve Norway and be approved by others at Wells Fargo.

**21.** 442 Mich. 76, 500 N.W.2d 104, 110 (1993).

**22.** *Id.* at 111. There is language in *Curry* that actually supports Judge Rindner's determination that Jobe's alleged promise "did not identify the amount of money to be advanced, the terms of repayment, or even who would be responsible for the repayment." The Michigan Supreme Court explained: "For a promise to loan money in the future to be sufficiently clear and definite, some evidence must exist of the material terms of the loan, including the amount of the loan, the interest rate, and the method of repayment." *Id.* at 113.

**23.** 45 P.3d 657, 670 (Alaska 2002).

**24.** The fact that Safar and Bjorn–Roli were both aware that Jobe did not have authority to increase the amount of the loan to Norway also supports a finding that Jobe's statements were

Because none of Jobe's alleged statements were definite as to the amount or terms of Wells Fargo's reimbursement to Safar, we affirm the superior court's finding and conclusion that Jobe did not make any promise or commitment to Safar sufficient to meet the "actual promise" element of promissory estoppel.[25]

## V. CONCLUSION

For the reasons described above, we AFFIRM the superior court's judgment and award of damages, costs, and attorney's fees.

CHRISTEN, Justice, not participating.

not an "actual promise." In *Simpson v. Murkowski*, 129 P.3d 435, 444 (Alaska 2006), we held that a 1993 letter from Governor Hickel to the Speaker of the House of Representatives was not an "actual promise" because it "expressly noted" that the program the letter proposed was subject to the legislature's approval. Similarly, the superior court's finding that Safar knew Jobe lacked the authority to approve additional funds and Safar's testimony that he understood that Norway would have to be involved in whatever

"arrangement" was made to reimburse him support a finding that Jobe's statements were not actual promises.

25. Because we conclude that Jobe's statements to Safar do not satisfy the first element of promissory estoppel, we need not determine whether any of the other elements of promissory estoppel were met.